IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>JESUS DANIEL DOMINGUEZ QUINONES,<br><br>　　　　　Defendant. | 8:23CR101<br><br>FINDINGS AND RECOMMENDATION |

　　　　This matter comes before the Court on the Motion to Suppress Evidence (Filing No. 49) filed by Defendant, Jesus Daniel Dominguez Quinones. Defendant moves to suppress evidence and statements obtained from a traffic stop and warrantless search of Defendant's rental vehicle on January 12, 2023. Defendant filed a brief (Filing No. 50) in support of the motion and the Government filed a brief in opposition (Filing No. 60).

　　　　The Court held a pre-hearing status conference with counsel on March 18, 2024, and held an evidentiary hearing on the motion on May 23, 2024. Defendant was present at the evidentiary hearing proceedings with his attorney, Denise E. Frost. The Government was represented by Assistant United States Attorney, Patrick C. McGee. Nebraska State Patrol officers, Jason Probasco ("Investigator Probasco") and Brandon Sutton ("Trooper Sutton"), testified at the hearing. The Court received into evidence, without objection, the following exhibits offered by the Government:

　　　　Exhibit 1.1 - Trooper Sutton's cruiser camera video of the traffic stop
　　　　Exhibit 1.2 -  Interior camera of Trooper Sutton's cruiser
　　　　Exhibit 2 - Trooper Sutton's body-worn camera from the incident
　　　　Exhibit 3 - Post-*Miranda* interview of Defendant conducted by Investigator Probasco
　　　　Exhibit 4 -  Copy of Nebraska State Patrol advice of rights with respect to this incident

The Court received into evidence, without objection, the following exhibits offered by Defendant:

　　　　Exhibit 101 - Trooper Sutton's affidavit in support of the warrantless arrest
　　　　Exhibit 102 - Traffic warning citation issued to Defendant
　　　　Exhibit 103 - Trooper Sutton's cruiser camera video of the traffic stop (overlaps with Ex. 1.1)
　　　　Exhibit 104 - Pretrial Services Report
　　　　Exhibit 105 - Copy of Neb. Rev. Stat. § 60-6,133

Exhibit 106 - Copy of Neb. Rev. Stat. § 60-367
Exhibit 107 - Ariz. Rev. Stat. § 28-2354

A transcript (TR.) of the hearing was prepared and filed on June 21, 2024. (Filing No. 79). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge will recommend that the motion be denied.

## BACKGROUND

Defendant is charged in the Indictment with knowing and intentional possession with intent to distribute and conspiracy to distribute more than 400 grams of fentanyl. (Filing No. 1). The evidence supporting the charges arises out of a traffic stop on January 12, 2023. At approximately 8:30 a.m. on that date, Trooper Sutton[1] was working in his capacity in the traffic division to enforce traffic safety. Trooper Sutton was positioned in his marked cruiser in the median facing southbound near mile marker 318 on Interstate 80 when he observed a silver Tacoma pickup truck traveling eastbound in the left lane at approximately the speed limit. Trooper Sutton observed the pickup slow down and merge to the right lane between two commercial motor vehicles. (TR. 41-42, 44). Trooper Sutton initially observed the pickup did not have a front license plate, and after it passed, he was unable to identify the rear license plate. However, Trooper Sutton testified he was not going to, and did not, conduct a traffic stop for a missing front license plate because there are 19 or 20 states that do not require two license plates, and he had been unable to identify the rear plate to verify if it was from one of those states. (TR. 42-43).

Trooper Sutton pulled out of the median and began to catch up to the vehicle, and in doing so observed the pickup "merge from the right lane to the left lane while it was driving approximately 64 miles mile per hour," and then observed the pickup "spe[e]d up to approximately 75 miles per hour as it overtook a commercial motor vehicle." (TR. 43). Trooper Sutton testified this "piqued" his interest because "when the [pickup] . . . began merging from the left lane to the right lane, the [pickup] activated its turn signal quickly. As it drove across the centerline, the [pickup] then merged in front of a commercial motor vehicle leaving a[n] unsafe and close distance causing the vehicle, the commercial motor vehicle behind it, to be following at a close and unsafe

---

[1] Trooper Sutton has been with the Nebraska State Patrol for six years and has received several hundred hours of training in conducting traffic stops, including criminal interdiction. (TR. 27-28). He has conducted approximately 4,500 stops in his career, and issued approximately 2,000 traffic citations. (TR. 30-31).

distance." Trooper Sutton testified this unsafe distance was approximately two car lengths, or half a second. (TR. 44).

During the hearing, Trooper Sutton testified regarding his cruiser video that captured the lane change.[2] Trooper Sutton explained the pickup left an unsafe distance in front of the semitruck after the pickup's lane change because:

> At 75 mile an hour, a motor vehicle's traveling approximately 110 feet a second. Most commercial motor vehicles in the state of Nebraska on large interstate systems are governed at 64 to 65 miles per hour meaning that a commercial motor vehicle is traveling at approximately 95 feet a second. That distance from the back of that vehicle to the front of that commercial motor vehicle is less than 95 feet.

(TR. 51).

Trooper Sutton testified regarding the traffic offense of improper passing in the same direction. He explained it involves "overtaking a vehicle on a . . . one-way, two lanes [highway], such as the interstate where you're overtaking a vehicle on the left and merging back into the original lane, which would be the right lane, the driving lane." Trooper Sutton says what he "most often see[s] is vehicles merging quickly in front of other vehicles," and it becomes a violation "when a vehicle merges in front of another vehicle at a[n] unsafe and close distance causing the vehicle into the rear to be following at a close and unsafe distance." Trooper Sutton testified the "rule of thumb" for an "unsafe distance" is two seconds, but his "personal thought" is that the distance "should be a truck tractor-trailer," i.e., "no less than one commercial motor vehicle." He testified he has conducted over one hundred traffic stops involving this infraction. (TR. 31-33). Trooper Sutton testified other factors that contribute to unsafe passing include a failure to signal, weather conditions, and the types of vehicle involved. For example, Trooper Sutton testified that a commercial motor vehicle like a semitruck trailer have larger blind spots due to the height and vision obstructions in the cab, and testified to his experience in personally observing a semitruck's limited visibility from the driver's seat. Additionally, Trooper Sutton testified it takes longer for a loaded commercial motor vehicle to come to a stop due to its weight. (TR. 34-35). Trooper Sutton testified he had been involved in "a lot" of investigations of traffic accidents involving semitrucks that were cut off by motorists due to improper lane changes. (TR. 36-37).

---

[2] Specifically, the first 32-seconds of the video file labeled "NSP978_Front_477_01122023083057.mp4" contained within Ex. 1.1.

Trooper Sutton caught up to the pickup and initiated a traffic stop near mile marker 326 for the improper lane change at approximately 8:33 a.m. (TR. 45-46). Trooper Sutton testified he waited to initiate the stop due to his location because if he had activated his lights immediately, he would have been next to a guardrail on a bridge. Instead, Trooper Sutton believed it would be safer to wait until he was over the hill into a flat spot where approaching traffic could see his vehicle. (TR. 45, 52; Ex. 1.1 at 00:32-1:46). Trooper Sutton called in a registration check on the pickup and informed dispatch he was conducting a traffic stop. (TR. 52; Ex. 1.1 at 1:46-2:14).

Trooper Sutton testified he has been trained to look for indicators of criminal activity when conducting a traffic stop. These include body language—nervousness, body quivering, rapid heartbeat, rapid breathing, and sweating in cold weather—rehearsed stories, and conflicts between stories of a vehicle's occupants. (TR. 29). Trooper Sutton testified his training to identify indicators of a rehearsed story includes an individual providing "the entire story without asking specific details about their purpose or their destination" in response to a "specific question about their travels." (TR. 29-30).

Trooper Sutton also testified that in his training and experience in criminal interdiction, the most common location drug smugglers may hide narcotics in a pickup are the natural factory voids in the tailgate, the bed of the pickup, or the spare tire under the bed of the pickup. (TR. 38). When Trooper Sutton is making a potential interdiction stop of a newer pickup truck, such as the one in this case, he will look for missing screws holding the plastic cover on the tailgate, as that could indicate the cover had been removed to smuggle illegal contraband in the natural factory void behind the panel. (TR. 39). Trooper Sutton testified another indicator of hidden contraband in a pickup are panels that appear to have been removed and replaced due to rust marks or paint chips. (TR. 40). Trooper Sutton testified if the tailgate of a pickup is open, there are "holes on the side of most tailgates and the bottom of a tailgate which you can look through the inside of a tailgate," providing a view of the factory void. (TR. 40-41).

During the hearing, Trooper Sutton testified regarding the events of the stop as captured by his body worn camera.[3] Trooper Sutton approached the passenger side of the pickup and observed a male driver—later identified as Defendant—and a male passenger—later identified as the co-defendant—that appeared to be sleeping. (TR. 45, 48). Trooper Sutton testified the fact that the passenger was sleeping at 8:30 a.m. was notable because it could be an indication the

---

[3] Specifically, the video file labeled, "114_477_011223151905_9.mp4" contained within Ex. 2.

4

vehicle's occupants had been driving for a long time and had not spent the night at a hotel. (TR. 57). Trooper Sutton contacted the pickup's occupants, informed them the reason for the stop was for merging at an unsafe distance, and requested their driver's licenses and vehicle information. (TR. 46, 54, 57-58; Ex. 2 at 1:52-2:21).

Defendant stated the pickup was a rental, which Trooper Sutton found suspicious because in his training and experience, drug trafficking organizations frequently use rental vehicles. Trooper Sutton asked Defendant to sit in the cruiser during the course of the stop, and patted him down when Defendant exited the pickup. Defendant mentioned he had a screwdriver in his pocket, which Trooper Sutton found suspicious because he had observed a screw was removed from the tailgate when he first approached the pickup. (TR. 58-59, 118-119; Ex. 2 at 2:21-4:00). On cross-examination, defense counsel asked Trooper Sutton why he did not mention the missing screw in his police report following the stop, and he could not recall. (TR. 93).

Trooper Sutton testified he asked Defendant to get out of the pickup to wait in his cruiser because in his experience, it is unsafe to leave an unknown driver in their driver's seat during the course of a traffic stop. In particular, Trooper Sutton "had an individual attempt to take my life a couple years ago," so he no longer lets a driver remain in the driver's seat, and makes the driver either stand outside or be seated in his cruiser. Because it was January and cold outside, Trooper Sutton directed the driver to the cruiser to sit for the course of the stop rather than stand outside. (TR. 122).

Trooper Sutton conducted a license check and a criminal history check ("Triple I," or the Interstate Identification Index) of Defendant through the Nebraska State Patrol dispatch, which typically takes five to ten minutes. While Trooper Sutton performed the tasks associated with the traffic violation, Trooper Sutton engaged Defendant in conversation. Trooper Sutton asked Defendant where he was coming from, and Defendant replied he was coming from Arizona to Las Vegas to Chicago to see his "baby mama," and to see his daughter who now lives in Chicago. Trooper Sutton testified Defendant's volunteering of more information than he asked for was suspicious. Trooper Sutton also testified south Arizona and Las Vegas are known as distribution hubs of illegal narcotics for transportation east to other large cities such as Chicago. (TR. 59-60; Ex. 2 at 4:00-4:57). Trooper Sutton testified that during their conversation, Defendant did not know the last name of his passenger, whom Defendant had stated was his uncle, which Trooper Sutton also found suspicious. Defendant also initially stated his passenger was his uncle, then later

5

stated he was his mother's cousin. (TR. 60). On cross-examination, it was clarified that Defendant actually stated he could not pronounce his uncle's surname, not that he did not know it. (TR. 98). When Trooper Sutton inquired about what Defendant's girlfriend did for a living, Trooper Sutton testified Defendant hesitated before answering she was a nurse. When Trooper Sutton asked Defendant where he was staying in Chicago, he replied he did not have to be back until Sunday, which Trooper Sutton observed would be a fast turnaround for driving halfway across the country. When Trooper Sutton asked Defendant where he stayed last night, Trooper Sutton believed Defendant deflected the question and instead answered that "all the rooms were full, they closed the door," and began talking about the pickup's tires. Defendant also stated he and his passenger were switching as drivers, which indicated to Trooper Sutton they were driving through the night, and driving a long distance in a short amount of time. (TR. 60-66, 103, 105; Ex. 2 at 4:57-10:55).

Trooper Sutton looked through the rental car paperwork Defendant provided. The rental contract indicated the car was due back in Arizona the following day, but Defendant had stated he did not know how long he was going to be in Chicago. (TR. 63-65, 68; Ex. 2 at 9:27-10:55). Trooper Sutton returned to the pickup to speak to the passenger. When Trooper Sutton asked what his relationship to Defendant was, the passenger replied Defendant was his nephew, which was inconsistent with Defendant's statement. (TR. 66-67; Ex. 2 at 10:55-12:26).

Trooper Sutton testified that during the course of the stop, he developed a belief criminal activity was afoot. Specifically, Trooper Sutton believed Defendant provided statements that felt rehearsed, and that the passenger and Defendant provided inconsistent statements of their relationship to one another. (TR. 47-48). Trooper Sutton stated his additional observations of Defendant's nervousness, his inconsistencies in his story, the missing screw on the pickup's tailgate, and the screwdriver in Defendant's pocket all contributed to Trooper Sutton's suspicions criminal activity was afoot. (TR. 69-70). Trooper Sutton also testified he had observed Defendant leave his driver's door open when he exited the pickup, and then rolled down the window in Trooper Sutton's cruiser to look south towards an open field, which Trooper Sutton believed indicated Defendant was looking for an escape route. (TR. 67-68, 109-110). Therefore, Trooper Sutton called for an El Paso Intelligence Center ("EPIC") check of the parties' criminal history, and radioed a request for a police canine handler, Trooper Raes. (TR. 67-68, 104, 106; Ex. 2 at

6

11:20-14:00). Trooper Sutton testified an EPIC check[4] is not part of a routine traffic stop, but he requested it due to his reasonable suspicion there was criminal activity afoot. (TR. 69).

Approximately sixteen minutes into the stop, Trooper Sutton discussed the improper lane change warning with Defendant, and printed the warning paperwork while he continuing to engage Defendant with conversation about what part of Chicago he was traveling to; Defendant replied he could not recall, but he had a piece of paper with the address in his bag and he has been there before, so he knows how to get there. Approximately eighteen minutes into the stop, Trooper Sutton begins returning Defendant's documents and gave him the warning ticket, but indicated he was still waiting on another check to come back (the EPIC check), which "could take a couple minutes."[5] Trooper Sutton then approached the passenger of the pickup to ask him if he knew his license had been surrendered and was invalid, asking him if he knew why. Trooper Sutton asked the passenger more questions about where they were coming from and their itinerary, and the passenger replied they were going to be in Chicago "maybe a day or two."

Trooper Sutton returned to his cruiser and again told Defendant he was "waiting on something to come back" and asked if Defendant if he "wanted to have a conversation with me," although he had completed the traffic stop. Defendant indicated that was okay. Trooper Sutton explained his interdiction duties to Defendant, and asked if he had anything illegal in the vehicle, such as marijuana, weapons, prescriptions, controlled substances, or large amounts of U.S. currency, and Defendant denied having anything illegal. Defendant sort of laughed when he said "no" in response to the question regarding cocaine, which Trooper Sutton described as a "different" answer than his other responses. Trooper Sutton asked Defendant for consent to search the pickup, and he replied, "yes sir." (TR. 48-49, 71-74; Ex. 2 at 16:35-22:31).

In conducting the search, Trooper Sutton pulled down the tailgate of the pickup and observed a heat-sealed bag inside the void of the tailgate through the side latch hole. Trooper Sutton removed the paneling to access the void within the tailgate, and found 11 heat-sealed bags with approximately 55,000 dosage units of M30 blue fentanyl pills. (TR. 74). Officers also found

---

[4] Trooper Sutton testified EPIC is a database "ran by the DEA out of El Paso that keeps information regarding OCDETF cases, which is organized crime, concealment methods, and also does "deconfliction with active DEA, . . . HSI, and customs and border patrol cases." (TR. 79).

[5] Ultimately, Trooper Sutton does not recall what the EPIC check returned, and he did not include the result of the EPIC check in his police report. Trooper Sutton did state in his report that neither party had a criminal history. (TR. 106-107).

7

a small amount of methamphetamine and cocaine in Defendant's possessions. Trooper Sutton placed Defendant in custody for transportation to NSP headquarters. (TR. 75).

Troopers Raes and Ortiz transport Defendant to NSP headquarters, and did not converse with him during that time. (TR. 75-76). Investigator Probasco[6] was called to assist Trooper Sutton with interviews of Defendant and his passenger following the traffic stop. (TR. 14-15). Investigator Probasco interviewed Defendant at NSP headquarters, approximately 1.5 hours after Defendant's arrest; Investigator Probasco believed Defendant was in the interview room for approximately thirty minutes before Investigator Probasco arrived. (TR. 17, 23-24).

Defendant's interview is contained at Exhibit 3. Defendant was handcuffed and placed in an interview room. Investigator Probasco explained who he was, who he worked for, and that he wanted to talk to Defendant about the arrest. (TR. 18). Investigator Probasco described the encounter as friendly. After obtaining Defendant's biographical information, Investigator Probasco provided Defendant with a *Miranda* rights advisory; Defendant appeared to understand the rights and signed a form waiving his rights. (TR. 19-20; Ex. 4). During the interview, Defendant was provided drinks when he said he was thirsty, was provided lunch after his interview extended beyond an hour, and Investigator Probasco helped Defendant remove his jacket when he stated he was getting warm. (TR. 21-22). During the approximately two and a half hour interview, Defendant made incriminating statements. (TR. 22; Ex. 3).

Defendant has filed the instant motion to suppress any statements and evidence seized from the traffic stop, arguing that such evidence was the fruit of an unlawful stop and detention. Specifically, Defendant contends Trooper Sutton did not have reasonable suspicion or probable cause to make the initial stop, and did not have reasonable suspicion to detain Defendant for additional interdiction investigation, including the EPIC check and procuring Defendant's consent to search. Defendant argues his consent to search was procured from the unlawful continued detention, as were his pre- and post-*Miranda* statements, and should therefore be suppressed as fruit of the "bad stop."[7] (Filing No. 50; TR. 133).

---

[6] Investigator Probasco has nearly 34 years of law enforcement experience, and is currently a sergeant with the investigative services division, assigned to the drug division and the drug task force. (TR. 14).

[7] At the hearing, defense counsel indicated Defendant was only challenging his consent and statements to the extent they were products or fruit of the unlawful stop and prolonged detention. (TR. 4-5, 10). However, Defendant's brief appears to also separately challenge the voluntariness of his consent and his statements. (Filing No. 50 at pp. 16-20).

8

## ANALYSIS

### I. Initial stop of the pickup

Defendant first challenges the stop of his vehicle, contending it was not based on probable cause or reasonable suspicion that a violation of law had occurred. (Filing No. 50 at p. 10). Defendant's brief asserts the pickup's license plate display was lawful, his speed was lawful, Trooper Sutton had no information Defendant or the pickup were committing any law violations, and the pickup maintained a safe distance before merging into the right-hand lane after passing the semitruck. (Filing No. 50 at pp. 10-12). Because the record is clear that Trooper Sutton effectuated the traffic stop of Defendant only for the traffic infraction of merging into the right hand lane at an unsafe distance after passing, Defendant's arguments regarding other traffic laws are irrelevant.

It is well established that "a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)). A traffic stop is a "seizure" under the Fourth Amendment and must be supported by probable cause or reasonable suspicion. *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013). Probable cause for a traffic stop exists "[a]s long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law." *Gordon*, 741 F.3d at 876 (alteration in original) (quoting *United States Coney*, 456 F.3d 850, 856 (8th Cir. 2006)). The question is not whether a traffic violation actually occurred, but is instead whether a reasonable officer would have believed that a traffic violation had occurred. See *Gordon*, 741 F.3d at 876.

As stated above, Trooper Sutton effectuated a traffic stop of Defendant and the pickup for making an improper lane change by merging at an unsafe distance after passing a semitruck in the right lane. Under Nebraska law, the driver of a vehicle using the left lane to pass another vehicle proceeding in the same direction "shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle." Neb. Rev. Stat. § 60-6,133 (1). Although the statute does not specifically define what constitutes a "safe distance," or being "safely clear of the overtaken vehicle," the Eighth Circuit has determined "[t]he two-second rule . . . is a 'widely used rule of thumb that accounts for the speed of traffic' and is an appropriate measurement of whether a trailing car is maintaining a reasonable and prudent distance." *United States v. Lopez*, 564 F.3d 1001, 1003 (8th Cir. 2009) (quoting *United States v. Andrews*, 454 F.3d 919, 921-22 (8th Cir. 2009)); see *United States v. Bailey*, No. 8:17CR61, 2017 WL 3700881, at *3 (D. Neb. Aug. 24,

9

2017). A violation of this statute provides probable cause to initiate a traffic stop. *United States v. Humphrey*, No. 8:02CR56, 2002 WL 1485387, at *1 (D. Neb. July 10, 2002) (quoting Neb. Rev. Stat. § 60–6,133(1)).

Trooper Sutton testified extensively regarding what constitutes a violation of this statute, and his observations leading him to believe Defendant committed the traffic offense of improper passing in the same direction. Trooper Sutton testified the offense involves "overtaking a vehicle on a . . . one-way, two lanes [highway], such as the interstate where you're overtaking a vehicle on the left and merging back into the original lane, which would be the right lane, the driving lane." Trooper Sutton testified the "rule of thumb" for an unsafe distance is two seconds, but his "personal thought" is that the distance should be a truck tractor-trailer" i.e., no less than one commercial motor vehicle. He testified he has conducted over one hundred traffic stops involving this infraction. Trooper Sutton testified another factor contributing to unsafe passing includes the types of vehicle involved. A commercial motor vehicle like the semitruck Defendant passed has larger blind spots due to the height and vision obstructions in the cab, and Trooper Sutton testified to his personal experience observing a semitruck's limited visibility from the driver's seat. Additionally, Trooper Sutton testified it takes longer for a loaded commercial motor vehicle like the one Defendant passed to come to a stop due to its weight. Trooper Sutton testified he had been involved in "a lot" of investigations of traffic accidents involving semis that were cut off by motorists due to improper lane changes.

Trooper Sutton testified he observed Defendant's pickup pass the semitruck in the left lane and then activate his turn signal "quickly" before merging in front of a semitruck, leaving approximately two car lengths, or half a second, between the semitruck. Trooper Sutton explained Defendant left an unsafe distance in front of the semitruck after the lane change because:

> At 75 mile an hour, a motor vehicle's traveling approximately 110 feet a second. Most commercial motor vehicles in the state of Nebraska on large interstate systems are governed at 64 to 65 miles per hour meaning that a commercial motor vehicle is traveling at approximately 95 feet a second. That distance from the back of that vehicle to the front of that commercial motor vehicle is less than 95 feet.

In reviewing the cruiser video of the lane change in Exhibit 1.1, the undersigned magistrate judge initially was skeptical that Defendant left an unsafe distance when merging in front of the semitruck. However, after additional review, and in consideration of Trooper Sutton's credible testimony, the undersigned magistrate judge's skepticism abated. Trooper Sutton testified that,

10

based on his experience working the interstate every day and conducting multiple traffic stops, one cannot accurately gauge the distance between vehicles off of a camera compared to real life. Trooper Sutton explained this is because the angle of the camera and position of vehicles may not provide an accurate location or timing, and it is easier to judge a distance in person than on camera. And, as outlined above, Trooper Sutton testified regarding the speeds of the vehicles he observed and how Defendant's merging left only two car lengths, or half a second, between the semitruck moving at interstate speeds, which under these circumstances he believed was not a safe merging distance. In light of the evidence and Trooper Sutton's experience, training, and thorough and credible testimony, the undersigned magistrate judge finds and concludes probable cause justified Trooper Sutton's initiation of a traffic stop of Defendant for violation of Neb. Rev. Stat. § 60-6,133 (1).

## II. Whether the permissible scope of the traffic stop was unlawfully exceeded

Defendant next argues that even if the initial traffic stop was valid, it became unlawful when Trooper Sutton exceeded its lawful scope. Specifically, Defendant argues Trooper Sutton "had no probable cause or reasonable suspicion to prolong the traffic stop to perform an EPIC check of Defendant," which "amounted to a separate unconstitutional 'stop' of Defendant." (Filing No. 50 at p. 16). Defendant also argues Trooper Sutton's interdiction investigation prolonged the traffic stop and exceeded the bounds of a permissible traffic stop, particularly where, "[g]iven that Defendant was stopped for nothing more than a traffic infraction," Trooper Sutton "commanded Defendant to get out of the Tacoma and come sit in the cruiser." (Filing No. 50 at p. 14).

An officer is permitted to detain a driver while completing routine tasks relating to the traffic violation. *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017). "Once the officer makes the traffic stop, the officer may lawfully check the driver's license and registration, ask the driver about his destination and purpose, and request that the driver sit inside the patrol car." *United States v. Espinoza*, 885 F.3d 516, 523 (8th Cir. 2018) (quoting *United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003)). "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). "Whether the duration of the stop is reasonable is determined by the seizure's 'mission,' and law enforcement must be 'reasonably diligent' in carrying out that mission." *United States v. Magallon*, 984 F.3d 1263,

1278 (8th Cir. 2021) (quoting *Rodriguez*, 575 U.S. at 354, 357). "Because traffic stops implicate officer safety, law enforcement can 'take certain negligibly burdensome precautions in order to complete [the] mission safely,'" and "[t]hose burdens will differ based on the mission." *Magallon*, 984 F.3d at 1278 (quoting *Rodriguez*, 575 U.S. at 350, 355). An officer may conduct certain unrelated inquiries absent reasonable suspicion, unless doing so "prolongs the stop." *Id.* Therefore, "when the mission is ongoing throughout law enforcement's interactions with the suspects of a stop, the stop will not be unreasonable when officers diligently pursue the mission and do not cause measurable delay." *Id.* (citing *United States v. Mosley*, 878 F.3d 246, 255 (8th Cir. 2017)). Once an officer finishes the tasks associated with a traffic stop, it is unreasonable to further detain the vehicle's occupants unless something occurs during the stop to generate reasonable suspicion to justify the further detention. *United States v. Gunnell*, 775 F.3d 1079, 1083-84 (8th Cir. 2015).

Defendant contends Trooper Sutton completed the mission of the traffic stop when he handed Defendant the traffic warning. At that time, Trooper Sutton was waiting for the results of the EPIC check to come back, which Defendant contends—and Trooper Sutton admits—is not a routine record check as part of the traffic violation, but is instead part of a separate investigation unrelated to the traffic violation. As such, Defendant contends Trooper Sutton needed reasonable suspicion, which he did not have, to continue to detain Defendant, and that evidence and statements derived from this unlawful detention must be suppressed. (Filing No. 50 at p. 15; TR. 69).

Here, Trooper Sutton initiated the traffic stop at 8:33 a.m., and completed the initial "mission" of the stop (processing the traffic infraction warning) at 8:51 a.m., approximately eighteen minutes after initiating the stop, when he handed Defendant the traffic warning and returned his driver's license. The undersigned magistrate judge finds Trooper Sutton was reasonably diligent in carrying out the "mission" of the traffic stop while completing the routine tasks relating to the traffic infraction warning. Immediately upon initiating the stop, Trooper Sutton called in a registration check on the pickup and informed dispatch he was conducting a traffic stop. Trooper Sutton then promptly approached the pickup, and began executing his routine tasks associated with the traffic stop and ensuring his safety, including checking the occupants' driver's licenses and the vehicle's rental paperwork, running a criminal history check, and requesting that Defendant sit inside the patrol car. See *Espinoza*, 885 F.3d at 523. The Eighth Circuit has stated an officer may lawfully request a driver sit in a patrol car during a traffic stop,

and Trooper Sutton testified to his personal and particular reason for asking all drivers to wait in his patrol car, as on a previous occasion a driver attempted to take Trooper Sutton's life when he was allowed to remain in his vehicle. Trooper Sutton's eighteen minute processing of the traffic warning was also reasonable considering Trooper Sutton was by himself and dealing with two occupants of the vehicle. There is no indication Trooper Sutton delayed his handling of the traffic infraction, and under the circumstances, Trooper Sutton diligently pursued the traffic violation investigation, and his unrelated interdiction inquiries did not measurably prolong the stop. See, e.g., *Murillo-Salgado*, 854 F.3d at 416 (finding a 23-minute stop—beginning as a traffic stop but evolving into an investigatory stop—was not an unconstitutional delay because the officer developed reasonable suspicion of drug-related activity during the routine traffic-stop tasks).

At the time Trooper Sutton completed the traffic warning for Defendant, Trooper Sutton was waiting for the results of the EPIC check. Trooper Sutton told Defendant that he was "waiting on some stuff to come back," referring to the EPIC check, and indicated Defendant would be "good to go" after that came back in a "couple of minutes." Defendant contends his detention became unlawful at this point because "there was no legitimate or lawful reason . . . to prolong the traffic stop after issuing the warning citation to Defendant" as the "mission" for the stop was over. (Filing No. 50 at p. 14). Trooper Sutton testified he believed he had reasonable suspicion to prolong the stop while he waited for the EPIC check, (TR. 130), and after review of the evidence and testimony, the undersigned magistrate judge agrees.

"An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered.'" *Magallon*, 984 F.3d at 1278 (quoting *Murillo-Salgado*, 854 F.3d at 415). Such suspicious facts must be "'specific and articulable facts which, taken together with rational inferences from those facts,' amount to reasonable suspicion that further investigation is warranted." *Id.* (quoting *Murillo-Salgado*, 854 F.3d at 415). A court's review of reasonable suspicion "looks to the totality of the circumstances, 'allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" *United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017) (alteration in original). "That suspicion must be objectively reasonable under the totality of the circumstances." *Magallon*, 984 F.3d at 1277 (citing *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018)). The court evaluates whether there

13

was reasonable suspicion by looking at the "totality of the circumstances" rather than "elements of suspicion in isolation." *United States v. Sanchez*, 955 F.3d 669, 674-75 (8th Cir. 2020).

After review, the undersigned magistrate judge finds Trooper Sutton had the requisite reasonable suspicion to prolong the traffic stop—and Defendant's detention—to pursue further investigation regarding other criminal activity, including waiting for the EPIC check and asking for Defendant's consent to search the pickup. Prior to completing the traffic warning at 8:51 a.m., Trooper Sutton pointed out several facts that, based on his training and experience, led him to believe criminal activity was afoot. Trooper Sutton first took note of Defendant's nervousness and "volunteering" more information than Trooper Sutton asked for—answering he was coming from Arizona to Las Vegas to Chicago to see his "baby mama," and to see his daughter who now lives in Chicago—when Trooper Sutton had only asked Defendant where he was coming from. Trooper Sutton testified he perceived Defendant's statements as "rehearsed," which is when an individual provides "the entire story without asking specific details about their purpose or their destination" in response to a "specific question about their travels," and can be an indicator of criminal activity. See *United States v. Martinez*, No. 8:22-CR-25, 2023 WL 4248451, at *5 (D. Neb. June 29, 2023) (considering officer's credible testimony that the defendant's story "story sounded rehearsed" in analyzing reasonable suspicion); *United States v. Betts*, 88 F.4th 769, 774-75 (8th Cir. 2023) (quoting *United States v. Jones*, 269 F.3d 919, 928-29 (8th Cir. 2001)) ("nervousness is generally of limited significance and must be treated with caution when analyzing reasonable suspicion, [but] it is not so limited when combined with 'other more revealing facts.'"). Trooper Sutton also testified south Arizona and Las Vegas are known as distribution hubs of illegal narcotics for transportation east to other large cities such as Chicago. See, e.g., *United States v. Noriega*, 35 F.4th 643, 650 (8th Cir. 2022) (concluding that officer's knowledge of Las Vegas as a common origin point for narcotics contributed to reasonable suspicion).

Trooper Sutton further took note that Defendant and his passenger provided inconsistent statements of their relationship to one another; at one point Defendant stated the passenger was his uncle, then later stated he was Defendant's mother's cousin. Then, despite this familial relationship, Defendant told Officer Sutton he could not pronounce his uncle's surname. Trooper Sutton also found their travel details suspicious, as the rental car contract indicated the car was due back in Arizona the following day, but Defendant had stated he did not know how long he was going to be in Chicago. Defendant also appeared to deflect Trooper Sutton's question about where

14

he stayed last night—and when combined with the details about switching drivers and given the passenger's sleeping at 8:30 a.m., Trooper Sutton believed they had been driving through the night, and driving a long distance in a short amount of time. Further, Trooper Sutton testified to his observation that Defendant appeared to be looking intently out the window at an open field, which appeared to suggest he was looking for an escape route. Among other things, indirect answers to officer questions, nervousness, strange travel plans, using a rental vehicle to drive a large amount of distance in a short time period, and inconsistencies "in response to an officer's routine questions about travel plans" are factors that support reasonable suspicion to expand a traffic stop. See *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021); *United States v. Gastelum*, 11 F.4th 898, 903 (8th Cir. 2021) (quoting *United States v. Pacheco*, 996 F.3d 508, 512 (8th Cir. 2021) (finding "'odd answers' and strange travel plans can support a finding of reasonable suspicion" to prolong traffic stops).

Defendant contends Defendant's description of his familial relationship to his passenger was not necessarily inconsistent, and tries to minimize the significance of the above facts by highlighting that each is innocent in isolation. If these were the only facts cited by Trooper Sutton supporting his suspicions, the undersigned magistrate judge may tend to agree. However, pushing Trooper Sutton's "mere hunch" firmly into "reasonable suspicion" was his additional observations of the missing screw in the tailgate of the pickup when he first approached, and Defendant's statement that he had a screwdriver in his pocket. Trooper Sutton testified that in his training and experience in criminal interdiction, a common location drug smugglers may hide narcotics in a pickup is in the natural factory void in the tailgate. To Trooper Sutton, the missing screw and screwdriver on a newer pickup truck, then, was extremely significant. See *United States v. Chartier*, 772 F.3d 539, 543-44 (8th Cir. 2014) (stating that the process of determining the existence of reasonable suspicion "allows officers to draw on their own experience and specialized training to make inferences"). Therefore, based on the totality of the circumstances, the undersigned magistrate judge finds Trooper Sutton had reasonable suspicion to continue to detain Defendant for further investigation once the "mission" of the traffic stop was completed.

### III. Defendant's consent to search

Defendant next argues his consent to the search of the pickup was ineffective because it was not voluntary. (Filing No. 50 at pp. 16-17). However, at the evidentiary hearing, defense

15

counsel indicated Defendant's position was that "based on the fact that the stop never should have occurred and then the fact that it was prolonged, that by the time it got to consent, the consent couldn't have been effective." Defense counsel stated Defendant's consent was therefore "tainted," and agreed with the Court that Defendant was "not contesting the grounds or whether the consent was voluntarily given on itself." (TR. 4). To the extent Defendant argues his consent was a product of an unlawfully prolonged detention, his argument fails because as discussed above, Trooper Sutton had reasonable suspicion to prolong his detention, and his consent was obtained within five minutes after Trooper Sutton finished processing the traffic warning.

To the extent Defendant still separately argues his consent to search was involuntary and "ineffective" because he was a "captive audience" in the police cruiser and was not told he had the right to refuse the search, the undersigned magistrate judge also rejects that argument. "A search conducted pursuant to a valid consent is constitutionally permissible." *United States v. Martin*, 982 F.2d 1236, 1238-39 (8th Cir. 1993). The test for a valid consent to search "is that the consent be voluntary, and voluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quotation omitted). "The issue turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented." *United States v. Garcia-Garcia*, 957 F.3d 887, 892 (8th Cir. 2020) (quoting *Espinoza*, 885 F.3d at 523 (8th Cir. 2018)). "Put another way, the analysis turns on whether it was reasonable for the officer to believe that the suspect gave him permission to search[.]" *Magallon*, 984 F.3d at 1280. The government bears the burden to demonstrate that the defendant knowingly and voluntarily consented to the search. *United States v. Gastelum*, 11 F.4th 898, 904 (8th Cir. 2021).

The court considers the totality of the circumstances to evaluate whether consent was voluntary, including

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Id.* (quoting *United States v. Carr*, 895 F.3d 1083, 1089 (8th Cir. 2018)). "An important consideration when assessing the voluntariness of consent is the environment in which [the defendant] consented." *Id.* (quoting *Carr*, 895 F.3d at 1089).

The video exhibits reflect a cordial and friendly discussion between Trooper Sutton and Defendant for the entirety of the stop, and nothing about Defendant's personal characteristics indicate he could not voluntarily consent. Defendant is a 28 year old male, and there was no evidence he was under the influence of drugs or alcohol. While Defendant does not have any prior arrests or criminal history that would give him experience with police procedures, that fact alone does not negate the voluntariness of his consent. The encounter was demonstrably free of "threats, physical intimidation, [and] punishment." *Carr*, 895 F.3d at 1089 (citations omitted). The video shows that Trooper Sutton was the only officer on the scene for the first portion of the stop, and was unauthoritative and polite. The stop occurred on the shoulder of Interstate 80 at 8:33 a.m., and was not secluded or remote. Defendant was seated in Trooper Sutton's cruiser, but was not handcuffed. Trooper Sutton had explained his interdiction duties to Defendant, and had asked him if he had any number of illegal items in his vehicle, so Defendant would have been aware of Trooper Sutton's ongoing interdiction investigation. True, Trooper Sutton did not tell Defendant he could refuse consent to search, but Defendant replied "yes, sir," immediately when Trooper Sutton asked, "Do you give me consent to search your vehicle?" Trooper Sutton's request for consent came approximately twenty-one minutes after initiating the stop, and approximately five minutes after providing the traffic warning to Defendant, which is not a particularly lengthy detention suggesting that Defendant's will was overborne or he was merely submitting to Trooper Sutton's authority. Trooper Sutton did not need to coax, goad, or otherwise persuade Defendant into giving his consent. Nothing about this encounter shows that Defendant's will was so "overborne and his capacity for self-determination [so] critically impaired" that "his consent to search must have been involuntary." *United States v. Johnson*, 956 F.3d 510, 516 (8th Cir. 2020) (citations omitted). And, under the totality of these circumstances, which were recorded on video, a reasonable officer would have believed that Defendant's consent to search was "the product of an essentially free and unconstrained choice that [he] was making." *United States v. Welch*, 951 F.3d 901, 906 (8th Cir. 2020) (citations omitted).

17

### IV.  Defendant's pre- and post-*Miranda* statements

Finally, Defendant argues his statements, both before and after he was given *Miranda* warnings, should be suppressed. (Filing No. 50 at pp. 18-20). At the evidentiary hearing, defense counsel represented all of Defendant's statements should be suppressed as they were the product of the prior illegal stop and illegally prolonged detention. (TR. 4-5). Defendant similarly argues in his brief, "Defendant's pre-Miranda incriminating statements flowed in uninterrupted fashion from Sutton's unconstitutional prolonging of the initial stop to do the EPIC search." (Filing No 50 at p. 19). Again, to the extent Defendant argues his statements were a product of an unlawful stop and prolonged detention, his argument fails because as discussed above, the initial stop was valid, and Trooper Sutton had reasonable suspicion to prolong his detention to pursue his interdiction investigation.

To the extent Defendant still separately argues his statements during the stop should be suppressed because they were "coerced" through a show of authority without *Miranda* while he was sitting in a police cruiser, the undersigned magistrate judge also rejects that argument. (Filing No. 50 at pp. 18-19). *Miranda* warnings are required when an individual has been subjected to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). However, most routine traffic stops do not trigger the need for *Miranda* warnings, and an individual temporarily detained pursuant to an investigatory traffic stop is not in custody for purposes of *Miranda*. See *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). A detained motorist is entitled to the protections prescribed by *Miranda* only if the treatment he is subjected to during the stop renders him "in custody" for practical purposes. *Id.* at 440. *Miranda* warnings must be given prior to any "custodial interrogation," which includes "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

Review of the video evidence and the surrounding circumstances demonstrate Defendant was not in custody for purposes of *Miranda* during the traffic stop, and that his statements were voluntary. Without belaboring the point, the same types of factors addressed above when determining that Defendant's consent was voluntary apply when determining whether Defendant's statements were voluntary: Trooper Sutton had a cordial and friendly discussion with Defendant; although Defendant was seated in the cruiser, he was not handcuffed or in a secluded location; Defendant is an adult male that was not under the influence of drugs or alcohol; Trooper Sutton

18

talked to Defendant one-on-one and did not threaten, intimidate, or otherwise show authoritative force to get Defendant to talk to him during the stop; and the stop was not particularly lengthy. Defendant was not handcuffed until after Trooper Sutton observed the heat-sealed bag inside the tailgate of the pickup at approximately 9:00 a.m., or just shy of thirty-minutes after he initiated the traffic stop. Under the circumstances, and after review of the video evidence, the undersigned magistrate judge finds *Miranda* warnings were not required, and Defendant's statements during the stop were voluntary.

Defendant argues his post-*Miranda* statements should be suppressed because the *Miranda* warnings and his waiver did not "purge the taint of prior unconstitutional acts by law enforcement." (Filing No. 50 at p. 19). Defendant does not separately argue his interview was involuntary or otherwise violative of *Miranda*. Because the undersigned magistrate judge finds Defendant's constitutional rights were not violated prior to the *Mirandized* interview, there is no "taint" that needs to be purged before Defendant's post-*Miranda* statements are admissible.

In sum, probable cause justified Trooper Sutton's initiation of a traffic stop of Defendant for violation of Neb. Rev. Stat. § 60-6,133 (1), Trooper Sutton developed reasonable suspicion during the course of the stop to prolong Defendant's detention, Defendant's consent to search was voluntary and not the product of an illegal stop and detention, and Defendant's statements were voluntarily made and were not the product of an illegal stop and detention. As such, suppression of any evidence and statements obtained from the stop is not warranted. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Brian C. Buescher, United States District Court Judge, that Defendant's Motion to Suppress Evidence (Filing No. 49) be denied.

Dated this 19th day of July, 2024.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such

objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.