IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. JESUS DANIEL DOMINGUEZ QUINONES, Defendant. | 8:23-CR-101 **MEMORANDUM AND ORDER ON OBJECTIONS TO FINDINGS AND RECOMMENDATIONS ON MOTION TO SUPPRESS** |

The Government has charged defendant Jesus Daniel Dominguez Quinones with conspiracy to possess with intent to distribute and possession with intent to distribute 400 grams or more of fentanyl. Filing 1. This charge stems from the defendant's encounter with law enforcement at a traffic stop near mile marker 318 on Interstate 80 in Nebraska on January 12, 2023. During the traffic stop, law enforcement uncovered 55,000 fentanyl pills in the defendant's vehicle. The defendant filed a Motion to Suppress, Filing 49, that the United States Magistrate Judge recommended be denied, Filing 92. Presently before the Court are the defendant's objections to the magistrate judge's Findings and Recommendation. Filing 96. The defendant contends that suppression is appropriate on several grounds: the traffic stop was without probable cause; the prolonged detention lacked reasonable suspicion; the search of the defendant's vehicle was not consensual; and the defendant's confession was tainted by these previous law enforcement errors. For the reasons stated below, after reviewing the matters *de novo*, the defendant's objections are

1

overruled, the magistrate judge's Findings and Recommendation are accepted, and the Motion to Suppress is denied.

## I. PRELIMINARY MATTER

Two of the defendant's objections to the magistrate judge's Findings and Recommendation relate to *Miranda* warnings. These objections state:

> C. Defendant objects to the Magistrate Judge's findings that Defendant was not unlawfully detained and *Miranda* advisements were unnecessary prior to Defendant's arrest.
>
> . . .
>
> E. Defendant objects to the Magistrate Judge's finding that Defendant's post-arrest, post-Miranda statements should not be suppressed.

Filing 96 at 2. Defense counsel clarified at the suppression hearing that these theories of suppression rely on the purported illegality of the traffic stop and prolonged detention. See Filing 79 at 5 (agreeing that the defendant is "not challenging whether *Miranda* was properly given or whether the statements were voluntary but, rather, that the statements were a product of the prior illegality and tainted"). Because the Court concludes that there was no "prior illegality," these objections are overruled. Moreover, while the defendant included these objections in his brief, he did not cite any supporting facts or law on either point and has therefore waived the arguments. *See United States v. Pacheco-Poo*, 952 F.3d 950, 953–54 (8th Cir. 2020) (arguments were waived when the proponent did not "cite any case nor detail any facts for th[e] argument"). The Court is "not obliged to consider [any] perfunctorily raised, undeveloped argument[.]" *In re Vera T. Welte Testamentary Tr.*, 96 F.4th 1034, 1039 (8th Cir. 2024) (quoting *United States v. Kirk*, 528 F.3d 1102, 1104 n.2 (8th Cir. 2008)).

2

## II. BACKGROUND

### A. Factual Background

The magistrate judge's Findings and Recommendation discusses the facts pertinent to the defendant's Motion in greater detail. *See* Filing 92 at 1–8. The following background information provides context for the Court's ruling on the defendant's objections.[1]

Trooper Brandon Sutton, the Nebraska State Patrol officer who conducted the traffic stop, testified at the Motion to Suppress hearing. Trooper Sutton has been a law enforcement officer for about six years, has received criminal interdiction training, and has conducted approximately 4,500 traffic stops in his career. Filing 79 at 28. Trooper Sutton discussed the traffic violation of "unsafe" or "improper passing," where a vehicle "merg[es] quickly in front of other vehicles" after passing. Filing 79 at 32–33. Trooper Sutton stated that there is a "rule of thumb [of] two seconds" of travelling distance to safely pass a vehicle, or approximately the length of "a truck tractor-trailer." Filing 79 at 33.

Trooper Sutton also testified as to his experience with criminal interdiction and narcotics transportation. Filing 79 at 38. Trooper Sutton explained that with regard to pickup trucks, "the most common location [to hide narcotics] on a pickup is the natural factory voids which are most often found in the tailgate, the bed of the pickup, or the spare tire under the bed of the pickup." Filing 79 at 38. He clarified that "[a] natural factory void is an opening created by the factory when the vehicle is created," and that one of these voids is present beneath "the plastic cover on the tailgate." Filing 79 at 38–39. Trooper Sutton testified that he looks for removed screws in the

---

[1] The Court has reviewed the video footage presented at the Motion to Suppress hearing conducted by the magistrate judge and the transcript of that hearing. Filing 92. The magistrate judge accurately recounted the facts adduced at the hearing and in the video footage in the Findings and Recommendation.

3

tailgate, especially on newer vehicles where "there's no reason that a tailgate screw should be removed," because the area "behind that panel is a large area [used] to smuggle illegal contraband." Filing 79 at 39.

Trooper Sutton testified about the events of January 12, 2023, when he was posted in his capacity as a Nebraska State Patrol officer near mile marker 318 on I-80 in the State of Nebraska. Filing 79 at 41–42. The defendant was driving a silver Toyota Tacoma pickup truck with Arizona license plates. Filing 79 at 52. At around 8:30 AM, Trooper Sutton saw the defendant's vehicle, which was moving at about the speed limit, pass a tractor trailer and merge into the lane in front of the tractor trailer. Filing 79 at 43. Trooper Sutton testified that there were "[a]pproximately two car lengths" or "half a second" of travelling time between the defendant's vehicle and the tractor trailer after the defendant merged. Filing 79 at 44. The video footage adduced at the suppression hearing corroborates Trooper Sutton's testimony regarding the space between the two vehicles when the defendant merged. Trooper Sutton then stopped the defendant's vehicle for improper passing or lane change in violation of Neb. Rev. Stat. § 60-6,133(1). Filing 79 at 46.

After Trooper Sutton pulled over the defendant's vehicle, he approached the vehicle and noticed that there was a screw missing from the cover of the tailgate. Filing 79 at 119. Upon reaching the vehicle, he observed the defendant driving and a male passenger sleeping. Filing 79 at 48. After Trooper Sutton informed the defendant of the purpose for the stop, the defendant stated that the pickup was a rental. Filing 79 at 58. Trooper Sutton testified that this fact aroused his suspicion, as in his "experience drug trafficking organizations, or DTOs, most often use rental vehicles due to knowing that rental vehicles cannot be seized by a law enforcement agency, they're not traced directly back to a trafficking organization or a criminal organization." Filing 79 at 58–

4

59. Trooper Sutton had the defendant exit the vehicle and patted down the defendant, who told Trooper Sutton that he had "a screwdriver in his pocket." Filing 79 at 59. Trooper Sutton found this suspicious, as rental vehicles tend to be newer and generally "don't need [to be] repaired other than tire repairs or oil changes." Filing 79 at 59–60. Trooper Sutton agreed that the "sleeping passenger, rental vehicle, [time of] 8:30 in the morning, [and] missing bolt on the tailgate" in totality aroused his suspicion. Filing 79 at 121.

Trooper Sutton then had the defendant sit in the police cruiser while Trooper Sutton "conduct[ed] a license check and a criminal history check through the Nebraska State Patrol dispatch." Filing 79 at 62, 121. These checks are required to issue a warning ticket. Filing 79 at 62. While conducting these checks. Trooper Sutton engaged the defendant in conversation. When Trooper Sutton "asked [the defendant] where he was coming from," the defendant "gave [ ] his entire story about he was coming from Arizona to Las Vegas to Chicago to see his baby mama and to also see his daughter who now lives in Chicago." Filing 79 at 60. Trooper Sutton found the defendant's elaborate response consistent with his interdiction training "that people sometimes will volunteer information" without solicitation to law enforcement. Filing 79 at 60. Trooper Sutton noted that Arizona and Las Vegas are "distribution hub[s]" and "source cit[ies]" for illegal narcotics. Filing 79 at 62. Trooper Sutton further noted that the defendant's itinerary indicated "a quick turnaround driving halfway across the country." Filing 79 at 65. In addition, when Trooper Sutton asked about the defendant's passenger, the defendant initially identified the passenger as

the defendant's uncle before stating the passenger was his mother's cousin. Filing 79 at 65. [2] The defendant also stated that he could not pronounce his passenger's name. Filing 79 at 98.

Trooper Sutton stated that by this point, he had "reasonable articulable suspicion that [ ] there was criminal activity going on." Filing 79 at 67. When asked to articulate the basis for his suspicion, Trooper Sutton responded, "What I found at that time was a rehearsed story, the nervousness provided by the driver, Mr. Quinones, the screw taken out of the tailgate on the pickup, the screwdriver in the -- Mr. Quinones's pocket. Due to his behavior in my vehicle answering questions and the inconsistencies in his own story." Trooper Sutton testified that he then "supplemented [his] reasonable articulable suspicion with even more information." Filing 79 at 70. Specifically, the defendant stated "that he didn't know how long he was gonna stay in Chicago." Filing 79 at 68. In addition, when Trooper Sutton questioned the passenger about his relationship to the defendant, the passenger "immediately responded that it was his nephew," which contradicted the defendant's statement that the passenger was the defendant's mother's cousin. Filing 79 at 69.

Shortly thereafter and before issuing the defendant a warning citation, Trooper Sutton called a police service dog handler, testifying that he then had "reasonable articulable suspicion that [ ] there was criminal activity going on." Filing 79 at 67. Trooper Sutton also placed an "EPIC check," which is "an El Paso Intelligence Center check run by the Drug Enforcement Administration" due to his suspicion of criminal activity, although he acknowledged that this is not "part of a routine traffic stop." Filing 79 at 69. After issuing the warning citation but before

---

[2] Law enforcement later learned that the passenger, codefendant Daniel Raymundo Alvillar, Jr., is unrelated to the defendant. Filing 79 at 126.

receiving a response from the EPIC check, Trooper Sutton told the defendant he was "waiting on something to come back." Filing 79 at 73. Trooper Sutton then asked the defendant if there were any narcotics or weapons in the car, which the defendant denied. Filing 79 at 73. However, when the defendant was asked about cocaine, the defendant "gave a different response than [to] all the other questions I asked," namely, by laughing. Filing 79 at 73. Trooper Sutton then asked the defendant for permission to search the vehicle, which the defendant granted. Filing 79 at 74. The passenger of the vehicle also consented to have his belongings searched. Filing 79 at 74.

Trooper Sutton then began to search the vehicle. He pulled down the tailgate and "observed through the side latch . . . a heat-sealed bag inside of the tailgate." Filing 79 at 74. After removing the paneling to access the inside of the tailgate, Trooper Sutton "observed 11 heat-sealed bags with approximately 55,000 dosage units of M30 blue fentanyl pills," which turned out to be "11 pounds of fentanyl pills." Filing 79 at 74.

## B. Procedural Background

The defendant was indicted on April 19, 2023, for conspiracy to possess with intent to distribute and for possession with intent to distribute 400 grams or more of fentanyl. Filing 1 at 1. The defendant filed a motion to suppress on December 21, 2023. Filing 49. The magistrate judge held a suppression hearing on May 23, 2024, Filing 73 (Text Order), and issued a Findings and Recommendation that the motion be denied on July 19, 2024, Filing 92. The defendant filed an objection on August 5, 2024. Filing 96. The defendant objects on the following bases:

- A. Defendant objects to the Magistrate Judge's finding that law enforcement had probable cause to believe that Defendant had committed a violation of Nebraska traffic laws, justifying the traffic stop.

B. Defendant objects to the Magistrate Judge's finding that Sutton had lawful reasons and reasonable suspicion to prolong the traffic stop and Defendant's detention and pursue a warrantless search of Defendant's vehicle.

C. Defendant objects to the Magistrate Judge's findings that Defendant was not unlawfully detained and Miranda advisements were unnecessary prior to Defendant's arrest.

D. Defendant objects to the Magistrate Judge's finding that Defendant's consent to search his vehicle was consensual and the product of a "cordial and friendly conversation" between law enforcement and Defendant.

E. Defendant objects to the Magistrate Judge's finding that Defendant's post-arrest, post-Miranda statements should not be suppressed.

F. Defendant objects to the Magistrate Judge's denial of Defendant's suppression motion.

Filing 96 (citations to the Findings and Recommendation omitted).

### III. ANALYSIS

#### A. Applicable Standards

Under the Federal Rules of Criminal Procedure, the Court "must consider de novo any objections to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3). When a party objects to a magistrate judge's proposed findings and recommendations, "[a] judge of the court shall make a de novo determination of those portions . . . to which objection is made." 28 U.S.C. § 636(b)(1); *accord Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) ("When a party timely objects to a magistrate judge's report and recommendation, the district court is required to make a de novo review of the record related to the objections[.]"). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If desired, a reviewing district court judge may "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.* Moreover, a party's failure to object in accordance with Rule 59 "waives a party's right to

review." Fed. R. Crim. P. 59(b)(2); *United States v. Merrett*, 9 F.4th 713, 716 (8th Cir. 2021) (noting that the defendant "did not object to the magistrate judge's order denying his motion, and his failure to object waives his right to review under Federal Rule of Criminal Procedure 59(a)"), *cert. denied*, 142 S. Ct. 815 (2022); *see also United States v. Chen*, No. CR 21-250 (JRT/TNL), 2023 WL 1466503, at *3 (D. Minn. Feb. 2, 2023) (quoting *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015)).

Under *de novo* review, a reviewing court "makes its own determinations of disputed issues and does not decide whether the magistrate[ ] [judge's] proposed findings are clearly erroneous." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). *De novo* review is non-deferential and requires an independent review of the entire matter. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When de novo review is compelled, no form of appellate deference is acceptable."); *United States v. Backer*, 362 F.3d 504, 508 (8th Cir. 2004) ("'De novo' is a Latin term literally meaning 'as new.' Our review is independent and not premised on the district court's appropriate use of its discretion. We are concerned only with the proper application of the law . . . ."). When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008). Here, the Court has read the transcript of the suppression hearing and has reviewed the exhibits admitted at the hearing.

### B. The Initial Traffic Stop

*1. The Magistrate Judge's Findings and the Parties' Objections*

The magistrate judge found that the initial stop of the defendant's vehicle was based on probable cause. Filing 92 at 9. The magistrate judge noted that "[u]nder Nebraska law, the driver of a vehicle using the left lane to pass another vehicle proceeding in the same direction 'shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle.'" Filing 92 at 9 (citing Neb. Rev. Stat. § 60-6,133(1)). The magistrate judge further noted that under Eighth Circuit precedent "the two-second rule is a widely used rule of thumb that accounts for the speed of traffic and is an appropriate measurement of whether a trailing car is maintaining a reasonable and prudent distance." Filing 92 at 9 (citing *United States v. Lopez*, 564 F.3d 1001, 1003 (8th Cir. 2009) (alterations omitted)). Although the magistrate judge found it difficult to discern from the video footage whether the defendant made an improper lane change, he credited "Trooper Sutton's experience, training, and thorough and credible testimony" in concluding that the defendant was—or that Trooper Sutton reasonably believed that the defendant was—in violation of Neb. Rev. Stat. § 60-6,133(1). Filing 92 at 10. The defendant objects to the magistrate judge's finding that Trooper Sutton had probable cause to believe that Neb. Rev. Stat. § 60-6,133(1) was violated. Filing 96 at 20–21.

*2. Applicable Standards*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "A traffic stop constitutes a seizure for Fourth Amendment purposes" and therefore must be

reasonable. *United States v. Pappas*, 452 F.3d 767, 771 (8th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). The Eighth Circuit has explained,

> To be reasonable, a traffic stop must be supported by, at a minimum, "a reasonable, articulable suspicion that criminal activity" is occurring. *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001). A traffic violation provides probable cause to the police to meet the constitutional reasonableness requirement. *United States v. Ehrmann*, 421 F.3d 774, 780 (8th Cir. 2005).

*Pappas*, 452 F.3d at 771. "An officer's observance of a traffic violation, no matter how minor, gives the officer probable cause to initiate a stop." *United States v. Banks*, 43 F.4th 912, 916 (8th Cir. 2022) (citing *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021)).

The purported traffic violation here was a violation of Neb. Rev. Stat. 60-6,133(1). This statute provides, "The driver of a vehicle overtaking another vehicle proceeding in the same direction shall first give a visible signal of his or her intention and shall pass to the left of the other vehicle at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle." Neb. Rev. Stat. 60-6,133(1). What it means to be "safely clear of the overtaken vehicle" is not specifically defined by the statute. However, the Eighth Circuit has weighed in on a similar provision of Nebraska's traffic laws, Neb. Rev. Stat. § 60-6,140(1), as follows:

> Nebraska law prohibits "follow[ing] another vehicle more closely than is reasonable and prudent." Neb. Rev. Stat. § 60-6,140(1). This statute contains no numerical criteria for assessing whether a driver's following distance is reasonable, but we have stated "that when one car trails another by less than two seconds, an officer will generally have probable cause to believe that the trailing car is closer than what is reasonable and prudent." *United States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006). After observing the [defendant's vehicle] traveling less than a second behind another vehicle, [the officer] reasonably concluded that the driver's following distance was not reasonable and prudent. He thus had probable cause for a traffic stop, and the district court properly denied the motion to suppress.

11

*Banks*, 43 F.4th at 916–17. The Court thus concludes that a passing vehicle is "safely clear of the overtaken vehicle" when the distance between the two vehicles is "reasonable and prudent," *i.e.*, when there is at least two seconds worth of travelling distance between the vehicles. *Id.*

   3. *Application*

The Court concludes that Trooper Sutton had the requisite "reasonable, articulable suspicion that criminal activity" was occurring when he stopped the defendant's vehicle. *Jones*, 269 F.3d at 924. Specifically, Trooper Sutton observed the defendant's vehicle change lanes before the defendant's vehicle was at least two seconds of travelling distance past the overtaken vehicle. In other words, Trooper Sutton identified a violation of Neb. Rev. Stat. 60-6,133(1) when the defendant failed to change lanes "until safely clear of the overtaken vehicle." This observed traffic violation "provide[d] probable cause to . . . meet the constitutional reasonableness requirement." *Ehrmann*, 421 F.3d at 780. Trooper Sutton's observation is well-supported by the video footage and his testimony before the magistrate judge.

Regarding the dash cam video and Trooper Sutton's testimony, the Court makes several observations. First, Trooper Sutton's testimony that the defendant's vehicle was traveling "approximately 75 miles per hour as it overtook a commercial motor vehicle," Filing 79 at 43, and that the commercial motor vehicle was traveling about 65 miles per hour, is supported by the video footage. Trooper Sutton further testified that a vehicle traveling 65 miles per hour travels about 95 feet per second.[3] Thus, the defendant was in violation of Neb. Rev. Stat. 60-6,133(1) if he changed lanes within less than two seconds of travelling distance, or in this case 190 feet, of the commercial

---

[3] Trooper Sutton's math is correct. One mile is equal to 5,280 feet. One hour is equal to 3,600 seconds. Thus, (65 miles / 1 hour) * (5,280 feet / 3,600 seconds) = 95.33 feet / 1 second.

motor vehicle. Both the dash cam video and Trooper Sutton's testimony give an objectively reasonable basis to believe the defendant's vehicle changed lanes within 190 feet of the commercial motor vehicle. Therefore, both the video and Trooper Sutton's testimony support the magistrate judge's finding that Trooper Sutton had probable cause to stop the defendant's vehicle.

### C. Prolonging of the Traffic Stop

*1. The Magistrate Judge's Findings and the Parties' Objections*

The magistrate judge found that the approximately 18-minute period between the initial traffic stop and the defendant's receipt of the warning citation constituted the traffic stop. Filing 92 at 11. The magistrate judge further found that the traffic stop was prolonged after the issuance of the warning citation when Trooper Sutton told the defendant he would be "good to go" after the results from the EPIC check came back. Filing 92 at 13. Finally, the magistrate judge found that Trooper Sutton had reasonable suspicion to prolong the traffic stop while he waited for the EPIC check after the defendant had received a warning citation. Filing 92 at 14–15.

The defendant appears to agree with the magistrate judge that the same 18-minute period constituted the traffic stop but contends that the traffic stop was not "reasonable in length." Filing 96 at 23–24. The defendant argues that Trooper Sutton "substantially inflated the time taken in the traffic stop by using a 'blended process', i.e. interspersing questions related to the actual reason for the stop with 'off topic' questions." Filing 96 at 24. The defendant contends that "[m]ore than 13 minutes of Sutton's questioning of Defendant was devoted to topics completely unrelated to the stop," including "repeatedly questioning [the passenger] Alvillar." Filing 96 at 24. In addition, the defendant objects on the basis that Trooper Sutton's asserted suspicions "were simply not true, reasonable, or consistent." Filing 96 at 22.

*2. Applicable Standards*

"A traffic stop is a seizure within meaning of the Fourth Amendment, and authority for the stop 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *United States v. Salkil*, 10 F.4th 897, 898 (8th Cir. 2021) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). These tasks may include "computerized checks of the driver's license and criminal history, and the writing up of a warning." *Salkil*, 10 F.4th at 898 (cleaned up and citation omitted). "[U]nrelated checks" are permitted if they do not "prolong[ ] the stop," and officers are permitted to "ask[ ] questions unrelated to the traffic stop" and "seek[ ] consent to search" vehicles. *Id.*

Prolonging a traffic stop requires reasonable suspicion. *United States v. Austin*, 104 F.4th 695, 699 (8th Cir. 2024) ("Once an officer finishes the tasks associated with a traffic stop, it is unreasonable to further detain the vehicle's occupants unless something occurs during the stop to generate reasonable suspicion to justify the further detention.") The Eighth Circuit has explained what is demanded by "reasonable suspicion," as follows:

> "Reasonable suspicion requires 'specific and articulable facts which, taken together with rational inferences from those facts, amount to reasonable suspicion that further investigation is warranted.'" *United Stqtes v. Gonzalez-Carmona*, 35 F.4th [636,] 641 [(8th Cir. 2022)] (citation omitted). This concept is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Accordingly, our review of reasonable suspicion "looks to the totality of the circumstances, 'allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.' " *United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017) (alteration in original) (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). Still, we view the totality of the circumstances not from an individual officer's subjective standpoint, but from the standpoint of an objectively reasonable officer. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

*Betts*, 88 F.4th at 773–74. "Furthermore, if in the process of questioning the individual the officer develops a reasonable suspicion or probable cause to believe that a crime is being committed by that individual, the officer may take further, reasonable action to confirm or dispel that suspicion or probable cause." *United States v. Turner*, 934 F.3d 794, 798 (8th Cir. 2019).

   3. *Application*

The Court agrees with the magistrate judge that the 18-minute period between the initial traffic stop and the issuance of the warning citation constituted the traffic stop. The defendant's assertion that Trooper Sutton unlawfully "inflated" the length of the traffic stop is unavailing. The video footage and Trooper Sutton's testimony demonstrate that the tasks during this period were "tied to the traffic infraction." *Salkil*, 10 F.4th at 898. Trooper Sutton's performance of "computerized checks of the driver's license and criminal history, and the writing up of a warning" constituted the bulk of this period. *Id.* The fact that Trooper Sutton "ask[ed] questions unrelated to the traffic stop" did not transform the traffic stop into a Fourth Amendment violation because it did not meaningfully "prolong[ ] the stop." *Id.* However, as all parties apparently agree, the EPIC check was unrelated to the traffic infraction and did in fact prolong the stop. Thus, "something [must have] occur[ed] during the stop to generate reasonable suspicion to justify the further detention." *Austin*, 104 F.4th at 699.

The Court further agrees with the magistrate judge that Trooper Sutton had reasonable suspicion of criminal activity that justified the prolonged detention of the defendant beyond the end of the traffic stop. Trooper Sutton articulated several bases for his suspicion of criminal activity during his testimony at the suppression hearing. "Reasonable suspicion looks to the totality of the circumstances, allowing officers to draw on their own experience and specialized training to make

inferences from and deductions about the cumulative information available to them." *Betts*, 88 F.4th at 773 (internal citation and quotations omitted). As Trooper Sutton was walking up to the defendant's vehicle, before he saw either occupant, he noticed three things that began to arouse his suspicion: a rental car, Filing 79 at 58, an Arizona license plate, Filing 79 at 52, and a missing screw from the tailgate, Filing 79 at 59. While Trooper Sutton admitted that any one of these things in isolation would not necessarily be suspicious, because of his experience and training, these circumstances in conjunction suggested criminal activity, specifically, transportation of contraband. Filing 79 at 121. Trooper Sutton testified that drug traffickers often rent vehicles with the knowledge that they cannot be seized as instrumentalities of criminal activity or traced back to criminal organizations. Filing 79 at 58. He further testified that Arizona is a source state for narcotics that get distributed throughout the Midwest. Filing 79 at 129. Finally, Trooper Sutton testified that a common place to smuggle narcotics in a pickup truck is in the void area of the tailgate, and that apart from accessing this space to smuggle narcotics, there is little other purpose to remove screws from a near-brand new truck. Filing 79 at 59.

Interactions with the defendant and his passenger only served to augment rather than "dispel" Trooper Sutton's growing suspicion of criminal activity. *Turner*, 934 F.3d at 798. First, the defendant had a screwdriver on his person, which tended to "confirm" Trooper Sutton's suspicion that the void of the tailgate was being used to store contraband. Second, the defendant and his passenger gave conflicting answers about their relationship to each other. *Id.* "Contradictory statements establish the reasonable suspicion necessary to detain a motorist further and to interview passengers." *United States v. Pulliam*, 265 F.3d 736, 740 (8th Cir. 2001) (citing *United States v. Edmisten*, 208 F.3d 693, 694 (8th Cir. 2000)). Third, the defendant and his

16

passenger were visibly nervous. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000); *see also Betts*, 88 F.4th at 774–75 (stating that "nervousness is generally of limited significance and must be treated with caution when analyzing reasonable suspicion, [but] it is not so limited when combined with 'other more revealing facts.'" (quoting *United States v. Jones*, 269 F.3d 919, 928–29 (8th Cir. 2001))). The defendant denied knowing how to pronounce the name of his passenger, who he variably referred to as his uncle and as his mother's cousin. The defendant recited what appeared to Trooper Sutton to be a rehearsed story. Also, the defendant's reaction to Trooper Sutton's question about cocaine in the car was noticeably distinct from the defendant's reaction to questions about weapons and cash. In addition, the defendant was evasive about the details of his travels. When the defendant provided information about his itinerary, Trooper Sutton, through his training and experience, found the quick turnaround nature of the travel to be consistent with narcotics transportation. The Eighth Circuit has recognized "that 'odd answers' and strange travel plans can support a finding of reasonable suspicion." *United States v. Gastelum*, 11 F.4th 898, 903 (8th Cir. 2021).

Under "the totality of the circumstances," *Betts*, 88 F.4th at 773, it was perfectly reasonable for Trooper Sutton to suspect that the defendant was engaged in criminal activity. These "specific and articulable facts which, taken together with rational inferences from those facts, amount[ed] to reasonable suspicion that further investigation [wa]s warranted'" and thereby justified prolonging the detention. *Gonzalez-Carmona*, 35 F.4th at 641. Thus, the Court agrees with the magistrate judge that the defendant's prolonged detention was proper.

### D. Consent to Search the Defendant's Vehicle

The magistrate judge determined that the defendant's consent to search the vehicle was voluntarily given to Trooper Sutton and therefore valid. The defendant's remaining objection states, "Defendant objects to the Magistrate Judge's finding that Defendant's consent to search his vehicle was consensual and the product of a 'cordial and friendly conversation' between law enforcement and Defendant." Filing 96 at 2. This argument is meritless.

"An individual may validly consent to an otherwise impermissible search if, in the totality of the circumstances, consent is freely and voluntarily given, and not the product of implicit or explicit coercion." *United States v. Farnell*, 701 F.3d 256, 263 (8th Cir. 2012) (citation omitted). "This is an objective standard such that 'a person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent.'" *Id.* (citing *United States v. Cedano–Medina*, 366 F.3d 682, 684–85 (8th Cir. 2004). "Consent is voluntary 'if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Fleck*, 413 F.3d 883, 891 (8th Cir. 2005) (citation omitted). The Eighth Circuit has formulated a multi-factor test to aid in the voluntariness determination, stating that court should consider:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

*Gastelum*, 11 F.4th at 904.

The Eighth Circuit further emphasized the importance of "consider[ing] the environment in which an individual's consent is obtained," and stated the following considerations:

> (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Gastelum*, 11 F.4th at 904.

Here, there is little doubt that the defendant gave his consent to Trooper Sutton's search of the vehicle freely and voluntarily. The defendant's age and mental condition favor a finding of voluntariness. The defendant was 27 years old at the time of the search and did not appear to be intoxicated. Moreover, although the defendant had not been informed of his *Miranda* rights and had no criminal history, the "environment" also favors finding voluntary consent. The length of the encounter was about 21 minutes, there were no threats, promises, or misrepresentations, and the defendant was not under arrest when consent was given. The magistrate judge's characterization of the discourse between the defendant and Trooper Sutton as "cordial and friendly conversation" is accurate. Evaluating the "totality of the circumstances," *Gastelum*, 11 F.4th at 904, the Court agrees with the magistrate judge that the defendant's consent was freely and voluntarily given.

### IV. CONCLUSION

For these reasons, and upon *de novo* review, the Court agrees with the findings and recommendation reached by the magistrate judge that suppression is not warranted in this case. Trooper Sutton had probable cause to perform the initial stop of the defendant's vehicle and reasonable suspicion to prolong the defendant's detention while he conducted an EPIC check. The

defendant gave his consent to search the vehicle freely and voluntarily. The defendant has waived any other objections. Accordingly,

IT IS ORDERED:

1. Defendant Dominguez Quinones's Objections to the Findings and Recommendation, Filing 96, are overruled;

2. The United States Magistrate Judge's Findings and Recommendation, Filing 92, is accepted; and

3. Defendant Dominguez Quinones's Motion to Suppress, Filing 49, is denied.

Dated this 5th day of September, 2024.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge